STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff-Appellee, *v.* JERRY W. LUCAS *et al.*, Defendants.—(COUNTRY MUTUAL INSURANCE COMPANY, Defendant-Appellant.)

Fourth District   No. 14074

Opinion filed July 25, 1977.

Richard F. Record, Jr., and Stephen L. Corn, both of Craig & Craig, of Mattoon (Gregory Ray, of counsel), for appellant.

Paul McWilliams, of McWilliams and McWilliams, of Litchfield, for appellee.

Mr. JUSTICE MILLS delivered the opinion of the court:

Two identical insurance policies.

Two different automobiles.

Both owned by Lucas.

But neither one was the vehicle Lucas was driving when the fatal accident occurred.

*Quaere.* Was he (it) covered?

On October 18, 1974, Lucas collided with a vehicle driven by Roger M. Ruch which resulted in Ruch's death. The vehicle in which Lucas was riding was also involved in a collision with a second automobile driven by Goins. The vehicle Lucas was driving at the time of the accident was neither of the two specific automobiles covered by the two policies—it was a 1949 Ford pickup truck. The automobiles covered were a 1968 Dodge and a Coronet of the same vintage.

Ruch's administrator subsequently sued Lucas. Plaintiff entered its appearance for Lucas and tendered a defense based upon a reservation of rights letter, which read in part:

"Our investigation discloses that you are not entitled to the benefits of said policy and we deny any obligation or liability to you hereunder because the vehicle you were operating did not qualify as a NEWLY ACQUIRED AUTOMOBILE (motor vehicle) as provided in our policy."

Shortly thereafter State Farm filed a declaratory judgment action seeking a declaration of its rights and obligations under the two policies. In addition to Lucas, the administrator, the other person involved in the

incident (Goins), and Country Mutual were made defendants. Country Mutual had a policy with the deceased Ruch which had an uninsured motorist provision. Following a series of depositions in both actions and the pleadings being settled, State Farm moved for summary judgment, which was granted. The court declared that plaintiff had no obligation under its policies with Lucas to defend and pay any judgment that might be obtained. This appeal (by Country Mutual only) followed.

The linchpin here is primarily a factual question.

The pivotal point, as we see it, is whether the Ford pickup was owned by Lucas. To bring this point into focus, Lucas' policies provided that a newly acquired vehicle would be covered provided that "as a condition precedent the named insured within thirty days following such delivery date applies to the company for insurance on such newly acquired automobile." The insurance company—State Farm—argues that Lucas' newly acquired '49 Ford pickup truck was owned by him more than 30 days preceding the accident on October 18—that is, from June or July. Also, if Lucas had not acquired ownership and was merely using the Ford truck belonging to another, his policies on the Dodge and Coronet would provide coverage under the "use of non-owned automobiles" provision.

Thus, the question—did he own it or not? and if he did, when?—are crucial. Country Mutual says that there is a genuine issue of material fact as to whether Lucas owned the pickup truck more than 30 days prior to the date of the accident. Hence, regardless of the correctness of the ruling, the matter must be tried and therefore, cries Country Mutual, we must reverse.

We glean the facts from the depositions of Lucas and his father-in-law, Sims. Lucas states that Sims "gave" him the truck in May 1974. Thereafter it was always in his possession. At the time Sims gave him the truck he signed the back of the title and handed it either to Lucas or his wife (according to Sims). Lucas in his deposition didn't know whether it was a gift to him or his wife, if it was a gift. At the time Sims turned over the title, it had not been notarized. So a week later (or maybe much later) Lucas went back to Sims to get the notarization. Sims took the nonnotarized title back, but Lucas continued in possession of the truck. About a week later (or much later, depending on whom you believe) Sims got the title notarized and handed it back to Lucas. Even after having been notarized the blank for the name of the transferee was still blank. In any event, Lucas filled out the requisite forms for the Secretary of State and mailed them in the latter part of June or the first part of July. Not until the day before the accident on October 18, 1974, did he receive back the title with a letter stating that he had not sent any money and therefore all the papers were returned with a request for the proper amount. While

he intended to send the forms back that evening he did not do so, hence at the time of the accident the title certificate was in Sims' name.

During the time he possessed the truck, Lucas put in a new engine but only drove it a couple of times, so he says, before the accident. This was the only work he had done to it, except painting it. According to Lucas, when Sims gave the certificate to him, Sims said, "I'll let you have the truck." Sims' license plates remained on the truck and were never changed prior to the accident. In addition to having the engine replaced and doing some painting, Lucas put his name on the back of the truck. He also mounted a parking decal of his place of employment on the windshield and also acquired a state safety sticker. One other point: Sims never drove the truck after giving it to Lucas.

There might be some dispute as to when the title was notarized. It happened to be September 24. At the time the application was made to the Secretary of State, Lucas was the named transferee. Lucas testified in the deposition—one of them—that he knew he did not own the truck until he got the title transferred. Sims, in his depositions said he gave up possession to Lucas and that Lucas became the owner at that time. He said that when he gave it to Lucas he told him that he would have to get it inspected, the title notarized and then to send it off to get his plates. He stated that at the time he gave possession he signed it over to Lucas in blank but advised Lucas (or rather instructed him) to fill in his name and get the license. Sims testified that he did not know whether the title was ever notarized. He considered it a gift to Lucas.

There are variations on many of these facts, particularly as to the title, and particularly as to when it was notarized and how. But to the view we take, these variations are not important.

■■ It seems to us rather clear that Sims intended to make a gift—and *intention* is the operative word in a gift context. He testified that he gave it to his son-in-law, he delivered up possession, never took it back, and delivered with the truck the title certificate with his endorsement so as to effect the transfer. The fact that he failed to write in the name of the transferee-grantee, or that it was unnotarized at the time, does not necessarily negate a donative intent. Customarily, this is all that a seller or grantor does—the seller may not even know his buyer at the time (as when a car is traded in) and while a donor has to know his donee, it is certainly not too much to ask of a donee that he do the paper work.

■■ While Lucas was not unexpectantly hazy as to whether he was a true donee, at the time he gave his depositions, he certainly had some inkling as a layman that the donee status was not for him—his actions belie his haziness. He took delivery of the truck and kept it. He put in a new motor when the old one wore out. He painted it. He got a parking

decal and a safety sticker. He painted his name on it. It was his intention to get the insurance transferred from one of his automobiles which he no longer intended to use and have it transferred to the truck. And this would have indeed been done, but for the accident. The court could certainly infer from these acts an intent by Lucas to accept the gift. He went further and took the steps necessary to have the title notarized, effected the naming of himself as the transferee and mailed it to the Secretary of State so as to have a certificate of title in his name. As we have seen, this last act never came to pass.

■■■ Country Mutual argues that until this happens the gift remains uncompleted. We can dispose of this argument quickly. The Illinois rule is that a gift of an automobile can be effected without going through the Secretary of State's office and that the donee acquires title regardless of such formalities. In short, the certificate of title issued by the Secretary of State is *evidence* of title, though it is not conclusive and one can own an automobile though the certificate of title is in the name of another. Here, we think, the intentional elements combine so conclusively that they rule out any question of fact that the gift (that is title and ownership) was in Lucas more than 30 days prior to October 18. Thus, the policies that he had did not provide coverage for him on the pickup truck on that date under either the newly acquired or nonowned automobile provisions thereof. One would really have to strive—and strive too hard, we might add—to find a genuine issue of a material fact. Accordingly, the allowance of the motion for summary judgment was in order. The Illinois cases supporting the rule as we have stated it are *General Accident Fire & Life Assurance Corp. v. Lindenmier* (1958), 16 Ill. App. 2d 585, 149 N.E.2d 343; *Perry v. Saleda* (1975), 34 Ill. App. 3d 729, 340 N.E.2d 314; *Ricke v. Ricke* (1970), 130 Ill. App. 2d 563, 264 N.E.2d 579.

Country Mutual seemingly relies on *General Accident,* but to us it stands for plaintiff's proposition.

■■ Country Mutual's final argument that plaintiff waived its right to deny coverage is without merit. The reservation of rights letter followed shortly after the suit against Lucas was filed which was about two months after the accident. The declaratory judgment action was instituted about two months after that, on February 5, 1975. Country Mutual cites *Cowan v. Insurance Co. of North America* (1974), 22 Ill. App. 3d 883, 318 N.E.2d 315, as authority for the proposition that the reservation of rights letter of plaintiff lacked the requisite specificity. This case holds, as we read it, that the notice is insufficient unless reference is made to the policy defense on which the company relies. As we have pointed out, the letter did indeed apprise Lucas of the nature of the policy defense. Again, it was timely; furthermore, the declaratory judgment action is in effect a reservation of

rights notice. (*Apex Mutual Insurance Co. v. Christner* (1968), 99 Ill. App. 2d 153, 240 N.E.2d 742.) Nor need the insured (Lucas) expressly consent to the reservation of rights notice though Country Mutual argues that he must. Acquiescence can be implied. (*Ancateau v. Commercial Casualty Insurance Co.* (1943), 318 Ill. App. 553, 48 N.E.2d 440.) Here State Farm's counsel filed an answer and represented him at the depositions.

Country Mutual argues further that counsel for State Farm violated the duty owed to Lucas because the interests of plaintiff were in denying coverage while that of Lucas was of being defended and thus plaintiff was serving two conflicting interests. As evidence of this breach of good faith, Country Mutual points to the deposition where it says the only testimony his counsel was interested in related to the issue of coverage and, therefore, to Lucas' disparagement, and cites *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24. This case holds that an attorney cannot represent both the insurer and the insured unless the insurer is willing to accept the attorney after he's been fully advised of the conflicting interest or, of course, where the insured waives its noncoverage policy defense. *Peppers* also stands for the proposition that where the insured does not accept the proffer of counsel the insured can choose his own attorney at the insurer's expense. In addition, *Peppers* holds that there must be a showing of prejudice to the "client."

■■ We cannot assume prejudice. It is true that testimony was elicited from Lucas at the deposition relating to the policy defense, but such was at the behest of counsel for Ruch's administrator in the wrongful death action, not by counsel for State Farm. One can argue prejudice but without some facts on which to base it, we must of necessity reject the argument. If there was evidence at the hearing on the motion for summary judgment which demonstrates this, it has not been reserved or presented to us for review. Accordingly, the order allowing the motion for summary judgment was correct.

Affirmed.

CRAVEN, P. J., and GREEN, J., concur.