NUDI AUTO RV AND BOAT SALES, INC., d/b/a Nudi Suzuki/Isuzu, Inc., Plaintiff-Appellant, v. JOHN DEERE INSURANCE COMPANY, Defendant-Appellee.

First District (3rd Division)    No. 1—01—1620

Opinion filed March 6, 2002.

John E. Passarelli, of John E. Passarelli, P.C., of Schaumburg, for appellant.

Patrick W. Brennan and Lawrence J. Drabot, both of Crivello, Carlson, Mentkowski & Steeves, S.C., of Milwaukee, Wisconsin, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

This is an insurance coverage case arising from the botched sale of 21 cars. It involves transactions between plaintiff Nudi Auto RV & Boat Sales, Inc. (Nudi), a car dealer, and MK Auto Sales, Inc. (MK), an automobile broker not a party to this lawsuit.

Between April and May 1997, MK bought several cars from auto auction houses. It earmarked 21 of them for Nudi. MK's intention was to sell the cars to Nudi, which it did, and then use that money to pay its debt with the auction houses. After paying off the debt, MK would deliver the certificates of title to the cars to Nudi.

Nudi paid for the cars, but MK never did deliver titles to them. It couldn't, because it never paid the auction houses. Nudi, wanting to keep the cars, ended up paying the auction houses $50,000 for the titles to the 21 cars. Then Nudi made a claim against its insurance company, John Deere Insurance Company (John Deere), for the $50,000 under its "False Pretense Coverage."

Nudi's "false pretense coverage" applied when it acquired "an 'auto' from a seller who did not have *legal title*." (Emphasis added.) The issue in this case is whether MK had "legal title" to the 21 cars it sold to Nudi.

The trial court entered summary judgment for the insurance company. We reverse the trial court's decision and remand this cause with directions to enter summary judgment for the insured.

## FACTS

### The Insurance Company's Policy

John Deere, an Illinois corporation with its principal place of business in Moline, Illinois, issued an insurance policy and "garage coverage" to Nudi, a Wisconsin corporation with its principal place of business—a car dealership—in Kenosha, Wisconsin. Nudi's policy included additional coverage for "false pretense."

Nudi's false pretense coverage was effective from October 1, 1996, to October 1, 1997. The scope of this coverage is now at issue. The pertinent provisions are as follows:

"FALSE PRETENSE COVERAGE

This endorsement modifies insurance provided under the following:
GARAGE COVERAGE FORM

I. SECTION I—COVERED AUTOS is amended, for this endorsement only, by the following:

*Any 'auto' you have acquired is a covered 'auto' under the False Pretense Coverage.*

II. SECTION IV—PHYSICAL DAMAGE COVERAGE is amended, for this endorsement only, by the following:

A. The following is added to paragraph A. COVERAGE:

1. False Pretense Coverage.

*We will pay for 'loss' to a covered 'auto' caused by:*

a. Someone causing you to voluntarily part with the covered 'auto' by trick, scheme, or under false pretenses.

b. *Your acquiring an 'auto' from a seller who did not have legal title.*

c. Confiscation of an 'auto' by a governmental or civil authority, for alleged or actual violations of laws governing the distribution, sale, or use of controlled substances."
(Emphasis added.)

The following facts are taken from the pleadings and the depositions filed with the pleadings.

### MK and the Auto Auction Houses

In April 1994, Mike Moses and his sister, Karen Moses, opened MK Auto Sales, Inc. MK was an automobile broker/used car dealer located in Mount Prospect, Illinois. It now is defunct. MK specialized in the wholesale selling of used cars to car dealers.

MK bought used cars from auto auctions conducted by Greater Chicago Auto Auction, Metro Milwaukee Auto Auction, Auction Way Sales, Inc., and ADT Automotive, Inc. (collectively the "auction houses"). MK had financial arrangements with these auction houses through their financial services departments. These arrangements allowed MK to bid/buy cars on credit, resell them to buyers/car dealers,

then use the money from the sale to pay off its debt. This process occurred as follows.

After MK filled out the appropriate paperwork and executed the proper documents—showing it was qualified and licensed to buy cars from an auction—the auction houses gave MK a "floor plan" or "bridge loan," *i.e.*, a credit line, to bid or buy cars with. The auction houses accepted checks, cash, and/or floor plans as payment for auctioned cars and they guaranteed the titles to the auctioned cars were valid and free of any incumbrance.

Through this financial arrangement, MK went to the auction houses and placed cars on its floor plan—MK had about a $200,000 floor plan limit. If, during the auctions, MK was the successful bidder, the auction houses sold MK the cars. Although MK took possession of the cars it successfully bid on, it did so without the certificates of title. The certificates of title remained in the owner's/seller's name and in the possession of the auction houses until MK paid off its debt, *i.e.*, floor plan.

After MK took possession of the cars, it transported them to its car lot in Mount Prospect, Illinois. Once the cars were on its lot, MK stocked, inventoried, and resold them. A majority of the cars MK bought on its floor plan were resold wholesale and in bulk to other car dealers.

When MK sold the cars it bought from the auction houses, *i.e.*, the cars on its floor plan, MK could not transfer the titles of the cars to the buyer/car dealer at the time of the sale; the auction houses still had them. MK filled out the appropriate paperwork, took cash or check from the buyer, gave the car or cars to the buyer, and deposited the money into its bank account. MK then went to the auction houses and paid for the car or cars with its own check.

Once the auction houses were paid, that is, when MK paid off its floor plan, the auction houses gave the certificates of title to MK—the certificates were put in MK's name. MK then signed the certificates, gave them to the buyer to sign, and sent them to the Secretary of State to register the titles in the buyer's name. After some time, the Secretary of State sent the buyer certificates of title registered in its name.

## MK and Nudi

In about December 1996, MK approached Nudi and asked if it could sell Nudi used cars wholesale. MK wanted to be, in essence, Nudi's "wholesaler." Nudi described a wholesaler as "somebody that would go out and try to place or buy an automobile for another dealer based on their wants and needs, make a small profit in the in between

so that they can make a living and buy and sell and place automobiles where they feel that there's a need."

Nudi agreed. Nudi said [it] didn't "have time to go out and buy and sell automobiles." Nudi had dealt with Mike Moses of MK before and trusted him.

Between April and May 1997, MK placed several cars on its floor plan at the various auction houses. MK then called Nudi and described the cars. Nudi was interested in them so MK took the cars to Nudi's car dealership in Kenosha, Wisconsin. Twenty-one of the cars Nudi chose to buy and pay for are at the center of this lawsuit.

After Nudi chose the cars it wanted, it gave MK a "check on the spot." The amount was about $179,000. At the time Nudi bought the cars, it did not receive the certificates of title from MK. Nudi knew that MK was going to use the money from the sale to pay off its floor plan.

Nudi allowed MK a two-week "grace period" to get the certificates of title from the auction houses. It expected to get the titles from MK within that time because Nudi and MK usually did business this way—it was common industry practice to buy and sell used cars the way Nudi and MK did.

Nudi never received the certificates of title for the 21 cars. At the time MK sold the cars to Nudi, MK suffered from what Moses described as "very poor business management." As a result, MK went out of business and was unable to cover checks it wrote to the auction houses to pay off its floor plan. The auction houses refused to turn over the certificates of title to the 21 cars MK sold to Nudi. In fact, because MK did not pay them, the auction houses wanted the cars back.

At his deposition, Mike Moses of MK explained what happened:

"Q. *** Do you know the circumstances under which the auction house was refusing to turn over the title? Do you know if the auction house was refusing to turn over the titles?

A. I believe they were, yes.

Q. And do you know why?

A. They claimed they weren't paid for.

Q. Were they, do you know?

A. They had checks for the cars that weren't any good at that time.

Q. The checks were not—

A. They had checks from MK that weren't any good at the time.

* * *

Q. Did MK ever pay for the automobiles for which checks were given that were not honored by the bank?

A. No.

* * *

Q. Okay. MK gave checks to Mannheim that were not honored by MK's bank; is that correct?

A. That's correct.

Q. And those checks were designed to pay for cars which were sold to Nudi Suzuki Isuzu; is that correct?

A. That's correct.

Q. Did MK Auto Sales ever pay Mannheim for those cars for which checks were dishonored?

A. No, sir.

Q. So, in other words, the cars that were sold to Nudi for which MK received payment were never paid for by MK to Mannheim. Is that a correct statement?

A. Yes.

* * *

Q. Okay. For those cars that were sold to Nudi, you never went through that scenario where you gave Mannheim checks and actually got titles for the cars you sold?

A. Correct. I never actually got the titles, that is correct.

* * *

Q. Okay. Since you went out of business around the 29th of May, did MK Auto Sales have the ability then to pay for and obtain the titles to the cars that were sold to Nudi Suzuki?

A. No.

* * *

Q. So, in other words, you never got—MK Auto Sales never got title, never paid for those cars directly to obtain the title, and after May 29 was unable to obtain title because it was out of business?

A. That's correct."

"I didn't mean for all of this to happen," said Mike Moses of MK, "I didn't do it on purpose, but I didn't have the money to pay for the cars either."

## Nudi and The Auto Auction Houses

The auction houses repossessed the cars MK had bought on its floor plan and had not yet sold, that is, the cars that were still in MK's car lot. After MK discussed its situation with Nudi, Nudi moved from its lot the 21 cars it bought from MK. Nudi wanted to avoid the auction houses. It did not want them to repossess the cars it bought from MK. Nudi "decided [to] keep them out of the way until [it] got counsel and found out what [its] legal recourse was."

Representatives of the auction houses contacted Nudi. They

demanded the return of the 21 cars sold to Nudi by MK. They made arrangements to repossess the cars from Nudi.

In an effort to keep the cars it bought and paid for, Nudi entered into a settlement agreement with the auction houses. According to the settlement agreement, the auction houses gave Nudi the certificates of title for the 21 cars and Nudi gave the auction houses $50,000.

### Nudi and Defendant John Deere

On about May 30, 1997, Nudi made a claim for loss under the false pretense coverage section of its insurance policy. Nudi told its insurer, John Deere, that it acquired 21 automobiles from a seller, MK, who did not have legal title. On about June 6, 1997, and again on about August 20, 1997, John Deere notified Nudi by letter that it was denying coverage for the losses sustained because

> "M.K. Auto Sales was not selling you vehicles with illegal titles. They were transferring ownership of the vehicles when they do not hold the physical title. This is done quite often in the auto market and does not mean that they do not own the auto or that an illegal title exist[s]. All M.K. Auto Sales had to do was pay for the vehicles and they would have received the titles. This is merely a collection problem."

In July 1998, Nudi filed this declaratory judgment action, contending "there exists coverage for the losses sustained by Nudi under the False Pretense Coverage endorsement of the policy of insurance issued by John Deere to Nudi." After a procedural history that took both parties from the Cook County circuit court to the federal court and back, Nudi and John Deere filed separate motions for summary judgment. In April 2001, the trial court denied Nudi's motion for summary judgment and granted John Deere's motion.

The trial court said, "I do not believe that Nudi has sustained its burden of proof proving that MK Auto Sales illicitly acquired vehicles from the Auctions when the vehicles were acquired by Nudi from MK Auto Sales. MK auto sales had legal title, and therefore I believe there was no coverage under the policy."

The trial court added that even if MK did not have legal title to the cars it sold to Nudi, "Nudi paid for the vehicle[s] it bought from MK Auto Sales, *** it was the bona fide purchaser for value without notice of any security interest or liens."

This appeal followed.

## DECISION

Nudi contends the trial court erred in ruling as a matter of law that MK had legal title to the 21 cars it sold to Nudi and that, even if MK did not have legal title, Nudi was a *bona fide* purchaser. We agree.

## STANDARD OF REVIEW

■ Summary judgment is proper when the pleadings, depositions, and admissions on file, together with the affidavits, if any, reveal there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See 735 ILCS 5/2—1005(c) (West 1998); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

We review *de novo* a trial court's order granting summary judgment. *Outboard Marine Corp.*, 154 Ill. 2d at 102. "When all parties file cross-motions for summary judgment, the court is invited to decide the issues presented as a question of law." *Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1091, 689 N.E.2d 259 (1997). We may affirm summary judgment based on any grounds supported by the record. *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 312 Ill. App. 3d 998, 1007, 728 N.E.2d 680 (2000).

## FALSE PRETENSE COVERAGE

The false pretense coverage endorsement (the endorsement) provides, in relevant part, the insurer John Deere will pay for loss to a "covered auto" caused by the insured acquiring an auto from a seller who did not have "legal title." Under the endorsement, any auto Nudi acquired is a covered auto.

■ Here, Nudi and John Deere agree "the subject [insurance] policy, specifically, the False Pretense Coverage endorsements, is clear and unambiguous and should be given its plain and ordinary meaning."

■ The construction of an insurance provision, and a determination of the rights and obligations thereunder, is a question of law suitable for summary judgment. See *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390-91, 620 N.E.2d 1073 (1993).

We construe the insurance policy as a whole, ascertaining the intent of the parties to the insurance contract, "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp.*, 154 Ill. 2d at 108. Where the policy's words are unambiguous, there is no need for construction; the words will be given their plain, ordinary, and popular meaning. *Outboard Marine Corp.*, 154 Ill. 2d at 108.

We agree with the parties: there are no ambiguous words in the insurance policy's false pretense coverage endorsement. Although the key words in the endorsement that are the subject of this appeal—*i.e.*, "legal title"—are not defined in the insurance policy, we will apply the words as written, unless they contravene public policy. See *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 442, 692 N.E.2d 1196 (1998).

John Deere contends "false pretense coverage is meant to protect the insured from the loss of a vehicle through deception. It is not coverage for poor business practices or an ordinary business risk, such as someone writing a bad check. The very essence of false pretense coverage is that there is an intentional deceptive act."

Nudi says, "It is evident that coverage exceeds mere loss of a covered auto by trick, scheme, or false pretense, all of which imply intent on the part of the perpetrator to defraud or steal. The language in Section II.A.1.b. appears clear on its face, that acquisition of a covered auto from someone who does not have legal title is a covered event for which the insurer, defendant, is liable under the terms of its policy."

■ We agree with Nudi. Whether the seller had "legal title" to the auto he sold to the insured is the key fact, not whether the "insured accepts a stolen vehicle in trade from someone who did not have legal title, or from someone who acquired a vehicle by fraud or deception," as John Deere suggests, and as the trial court found.

We note that while the title of section II(A)(1) is "False Pretense Coverage," only section II(A)(1)(a) uses the term "false pretenses." Section II(A)(1)(c) clearly is not a false pretense provision. It refers to "Confiscation of an 'auto' by a governmental or civil authority."

Section II(A)(1)(b) of the endorsement contains no mention of an intent to defraud. That is, there is no requirement the cars sold by MK be stolen or acquired by fraud. As the endorsement says, "Any 'auto' you have acquired is a covered 'auto' under the False Pretense Coverage."

The trial court erred in finding Nudi had a burden to prove that "MK Auto Sales illicitly acquired vehicles from the Auctions when the vehicles were acquired by Nudi from MK Auto Sales."

The next question, then, is whether the record demonstrates the seller, MK, had "legal title" to the cars it sold to Nudi, as that term is used in the policy.

The record is clear, and as Mike Moses of MK agreed: "MK Auto Sales never got [certificates of] title, never paid for those cars directly to obtain the [certificates of] title, and after May 29 was unable to obtain [the certificates of] title because it was out of business."

■ Black's Law Dictionary 1493 (7th ed. 1999) defines "legal title": "A title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest."

John Deere contends "there is a distinction between a certificate of title and legal title." "While MK did not receive the actual, physical certificates of title from the auction," concedes John Deere, "the understanding of the parties was for legal title to transfer, especially

where possession and control of the vehicles *did* pass from the auction to MK, and from MK to the Plaintiff." (Emphasis in original.)

John Deere cites no support for its contention. That is because its contention is mistaken—John Deere attempts to argue the term "legal title," as used in the endorsement, means ownership.

We find John Deere's concession that MK did not receive actual physical title fatal to its case. Although John Deere is correct in saying possession and control of the cars passed from the auto auction houses to MK, it clearly is not correct in saying that the understanding of the auction houses was to pass to MK legal title. That is because no legal title could be transferred until MK paid for the cars. And MK did not.

A certificate of title to an automobile is " 'evidence of [legal] title.' " (Emphasis omitted.) *Pekin Insurance Co. v. U.S. Credit Funding, Ltd.*, 212 Ill. App. 3d 673, 677, 571 N.E.2d 769 (1991), quoting *State Farm Mutual Automobile Insurance Co. v. Lucas*, 50 Ill. App. 3d 894, 898, 365 N.E.2d 1329 (1977). See *American States Insurance Co. v. White*, 341 Ill. App. 422, 94 N.E.2d 95 (1950) (abstract of op.) (upon execution of a conditional sales contract, the buyer became equitable owner of the automobile and assumed the unconditional obligation to pay for the automobile, but the seller held legal title to secure the payment of the balance of the purchase price).

Our review of the record shows MK never had legal title to the cars it sold to Nudi, because the auction houses did not intend to transfer legal title to the cars until they were paid. *Dan Pilson Auto Center, Inc. v. DeMarco*, 156 Ill. App. 3d 617, 509 N.E.2d 159 (1987), supports our conclusion.

In *Dan Pilson Auto Center*, the plaintiff, Dan Pilson Auto Center, brought a replevin action seeking to recover possession of six squad cars from the defendant, the sheriff of Sangamon County, William DeMarco. Pilson testified he had entered into an oral agreement to sell six used squad cars to Leo Palmeri, a buyer/broker for a car dealership. *Dan Pilson Auto Center*, 156 Ill. App. 3d at 618.

Sometime after the agreement was made, Palmeri told Pilson he sold the squad cars to his customer, the Sangamon County sheriff. Palmeri asked Pilson whether it would be all right if the sheriff picked up the squad cars, as the sheriff was anxious to get the vehicles. Palmeri said he would be arriving shortly after the sheriff's men, but that Pilson should allow the sheriff to take the cars. Pilson agreed to the arrangement. *Dan Pilson Auto Center*, 156 Ill. App. 3d at 619.

Captain Pyle of the Sangamon County sheriff's department arrived at Pilson's dealership. Pyle signed a "delivery receipt" and took possession of the cars. Pilson kept the certificates of title. *Dan Pilson Auto Center*, 156 Ill. App. 3d at 619.

Palmeri never showed up after the sheriff took possession of the squad cars and never paid Pilson, although the sheriff's department had paid Palmeri. *Dan Pilson Auto Center,* 156 Ill. App. 3d at 619-20.

In *Dan Pilson Auto Center,* the court held: "Palmeri, the seller, had no title at all" where the "[e]vidence clearly established that Pilson never transferred the certificates of title for the squad cars" and "[b]oth parties *** acknowledged that the cars were released to Pyle as 'an accommodation to the sheriff,' who was in dire need of additional squad cars." 156 Ill. App. 3d at 621. "Since Palmeri had nothing to convey, the sheriff never received title to the cars," said the court. *Dan Pilson Auto Center,* 156 Ill. App. 3d at 623.

According to the court, "While the failure to transfer certificates of title alone might be insufficient to sustain a finding for Pilson, this fact, in conjunction with evidence of the parties' intent, indicates that although possession passed, there was no concurrent intent to transfer ownership." *Dan Pilson Auto Center,* 156 Ill. App. 3d at 621.

■ Here, the auto auction houses can be read as Pilson; MK as Palmeri; and Nudi as the sheriff.

As in *Dan Pilson Auto Center,* the record in this case shows the existence of two separate sales contracts: the first between the auto auction houses and MK, and the second between MK and Nudi. Although the auto auction houses gave MK possession of the cars, all parties understood their separate transactions were not yet complete.

MK knew it would not receive title to the cars, and therefore not own them, until it paid the auction houses for them. Likewise, Nudi knew it would not receive title to the cars, and therefore not own them, until MK paid the auction houses for them.

The trial court erred in finding MK had legal title. MK did not. We find that under the false pretense coverage endorsement of Nudi's insurance policy, Nudi acquired "an 'auto' from a seller who did not have legal title" and John Deere must cover Nudi's losses.

## *BONA FIDE* PURCHASER/BUYER IN THE ORDINARY COURSE

■ John Deere contends that even if we find MK did not have legal title to the cars, legal title was transferred because "Nudi was a *bona fide* purchaser for value without notice of any security interest or liens."

This is not a case about who had lawful possession of the cars. Nudi paid an extra amount for the amended coverage endorsement at issue. The endorsement specifically limited the "autos" Nudi acquired to those for which the seller *did not have* legal title. As such, there

were no additional conditions placed within the false pretense endorsement.

John Deere contends the plain, ordinary, and popular meaning of the words "legal title" encompasses, by definition, a seller like MK, who is able to transfer legal title to a *bona fide* purchaser or a buyer in the ordinary course of business, like Nudi. We do not agree.

The endorsement says, "Your acquiring an 'auto' from a seller who *did not have* legal title." (Emphasis added.) It does not say, "Your acquiring an 'auto' from a seller who *could transfer* legal title to you."

Illinois law defines a vehicle "owner" as "[a] person who holds legal document of ownership of a vehicle." 625 ILCS 5/3—100 (West 1998). With certain inapplicable exceptions, a certificate of title is required for every vehicle owned in Illinois. 625 ILCS 5/3—101 (West 1998). If for some reason there is no certificate of title in existence, the owner must apply to the Secretary of State for a certificate of title. 625 ILCS 5/3—101 (West 1998).

The proper way to effectuate a transfer of ownership of a motor vehicle in Illinois is by assignment and warranty of title. 625 ILCS 5/3—112, 3—113 (West 1998). Although failure to comply with section 3—112 or 3—113 does not necessarily affect passage of title to a motor vehicle (*State Farm Mutual Automobile Insurance Co. v. Lucas*, 50 Ill. App. 3d at 898-99), a purchaser of a motor vehicle cannot receive any greater title or interest in a motor vehicle than the seller had at the time of the sale. *Dan Pilson Auto Center*, 156 Ill. App. 3d at 621, citing Ill. Rev. Stat. 1985, ch. 16, par. 2—403(1) (now 810 ILCS 5/2—403(1) (West 1998)).

Here, MK, the seller, had no title at all. Thus, the statutory provisions regarding voidable title are inapplicable. See 810 ILCS 5/2—403(1) (West 1998). See also *Dan Pilson Auto Center*, 156 Ill. App. 3d at 621.

John Deere also contends the Uniform Commercial Code (the UCC) additionally provides that if goods are entrusted to a "merchant[, MK,] who deals in goods of that kind," the merchant has "power to transfer all rights of the entruster to a buyer in ordinary course of business[, Nudi]." See 810 ILCS 5/2—403(2) (West 1998).

We find section 2—403(2) of the UCC (810 ILCS 5/2—403(2) (West 1998)) does not apply to this case. The UCC does not refer to "legal title." The purpose of this provision of the UCC is: "The many particular situations in which a buyer in [the] ordinary course of business from a dealer has been protected against reservation of property or other hidden interest are gathered by subsections (2)-(4) into a single principle protecting persons who buy in [the] ordinary course out of inventory." 810 ILCS Ann. 5/2—403, Uniform Commercial Code Comment, at 289 (Smith-Hurd 1993).

Nowhere is it said in the UCC that the merchant who sold the entrusted goods to the buyer in the ordinary course of business is vested with legal title. As such, whether Nudi qualifies as a buyer of the cars in the ordinary course of business does not matter. MK still did not have legal title and, by its contracts, could not get legal title until it paid the auction houses for the cars. It never did. John Deere may not claim noncoverage.

## COSTS AND ATTORNEY FEES

Nudi contends John Deere advanced its coverage position in bad faith. Nudi argues that pursuant to section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 1998)), it is entitled to reimbursement of attorney fees, as well as sanctions against John Deere.

■ Section 155(1) of the Illinois Insurance Code states:

"In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, [and] other costs[.]" 215 ILCS 5/155(1) (West 1998).

Nudi contends John Deere engaged in vexatious and unreasonable conduct in denying Nudi's tender. However, "where a *bona fide* dispute concerning coverage exists, costs and sanctions are inappropriate." *State Farm Mutual Automobile Insurance Co. v. Smith*, 197 Ill. 2d 369, 380, 757 N.E.2d 881 (2001).

■ Here, the trial court determined John Deere correctly relied on the false pretense coverage endorsement in denying Nudi's tender. Although we hold the trial court erred, we find there existed a *bona fide* dispute concerning John Deere's potential coverage in this case. Costs and sanctions are inappropriate.

## CONCLUSION

We reverse the trial court's decision and remand this cause with directions to enter summary judgment for Nudi on the issue of coverage. We deny any grant of costs or fees under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 1998)).

Reversed and remanded.

CERDA and SOUTH, JJ., concur.