THIRD DIVISION
March 7, 2007

No. 1-05-4079

| | | |
|---|---|---|
| LIBERTYVILLE TOYOTA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. BANK, | ) | |
| | ) | |
| Defendant-Appellee | ) | No. 03L4584 |
| | ) | 03L6716 |
| (Volvo Sales and Service Center, d/b/a Volvo of | ) | |
| Lisle, and d/b/a Honda of Lisle, | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| Automotive Lease Corporation, | ) | The Honorable |
| | ) | Dennis J. Burke, |
| Defendant). | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiffs Libertyville Toyota (Libertyville) and Volvo Sales and Service Center, doing

business as Volvo of Lisle and also doing business as Honda of Lisle (Lisle), brought suit in the

circuit court seeking declaration of ownership of several motor vehicles whose possession had

been transferred from Libertyville and Lisle to defendant Automotive Lease Corporation (ALC)

and thereafter transferred to defendant U.S. Bank.

Libertyville and Lisle are motor vehicle dealerships, ALC is a motor vehicle leasing

company and U.S. Bank is a banking institution.

Following a bench trial, the trial court found that U.S. Bank owned the subject vehicles.

Libertyville appeals. Neither Lisle nor ALC is a party to this appeal.

No. 1-05-4079

On appeal, Libertyville contends that the trial court's determination that Libertyville and ALC intended ownership of the subject vehicles to be transferred at the time of the transfer of possession was contrary to the manifest weight of the evidence and that ALC therefore did not have appropriate title or interest to the vehicles to allow a subsequent transfer to U.S. Bank.

Libertyville argues that ALC, not having title to the vehicles, could not transfer them pursuant to section 2-403(1) of the Uniform Commercial Code (the UCC) (810 ILCS 5/2-403(1) (West 2004)). Libertyville further argues that U.S. Bank was not a "buyer in the ordinary course of business" and therefore could not obtain ownership of the vehicles pursuant to section 2-403(2) of the UCC (810 ILCS 5/2-403(2) (West 2004)). Finally, Libertyville argues that U.S. Bank was judicially estopped from claiming ownership of the vehicles because of its assertions in another action in the United States District Court relating to the issues presented here. We affirm.

At trial, Kevin Keefe, the president and general manager of Libertyville, Jeffrey Carr, the general sales manager of Lisle, and Timothy Cacciatore, the regional sales manager of U.S. Bank, testified. The evidentiary deposition of Robert Mueller, an assistant general counsel of the Illinois Secretary of State, was admitted. The following relevant evidence was adduced.

As an intermediary leasing company, ALC received requests for certain vehicles from its customers and, in turn, located those vehicles at motor vehicle dealerships, bought them, then leased or sold them to its customers. Libertyville and ALC had been doing business with one another for about two years.

Between April 15, 2002, and July 29, 2002, ALC arranged to buy six vehicles from

2

Libertyville. As was their usual practice, Libertyville's and ALC's agents executed a contract for each vehicle. The contracts entered into by Libertyville and ALC were the same contracts used by Libertyville when it sold vehicles to retail customers. The contracts provided that the purchaser's signature constituted a binding commitment to purchase the vehicles. Additionally, Keefe testified that he understood the contracts to be binding commitments to sell and purchase the vehicles. Each contract further provided that the written contract constituted the entirety of the agreement between the parties.

ALC then took possession of the vehicles; however, ALC did not pay for the vehicles at that time. Keefe testified that this was the parties' usual custom: ALC would take possession of the vehicle, then, at a later date, sometimes as many as 45 days later, ALC would tender payment for the vehicle. As was its custom, and the custom of the industry, Libertyville retained the manufacturer's certificates of origin (MCOs) for the vehicles until ALC tendered payment. An MCO is issued by the manufacturer of a vehicle and must be filed with the Secretary of State in order to obtain a title for the vehicle.

After taking possession of the vehicles, ALC leased them to its customers. ALC then sold the vehicles and its leases to U.S. Bank, with which it had been doing business since 1999. Though U.S. Bank's formal internal guidelines required it to obtain a new vehicle's MCO or a copy of the dealer's buyer's order listing U.S. Bank as the owner of the vehicle in order to fund such a transaction, Cacciatore testified that U.S. Bank's custom in dealing with ALC was not to follow those guidelines. Instead, U.S. Bank obtained copies of the contracts between ALC and

Libertyville before entering the agreement with ALC.[1]  Again, the contracts were binding agreements for the purchase of the subject vehicles.  After receiving the contracts, U.S. Bank provided funding to buy the vehicles from ALC, paid ALC for the vehicles and took possession of the vehicles.

Cacciatore testified that at the time of the agreement, he did not know whether ALC had already paid Libertyville for the vehicles but that he believed that, because ALC had possession of the vehicles, and because ALC had provided contracts reflecting the sale of the vehicles from Libertyville to ALC, ALC was the rightful owner of the vehicles.  Cacciatore believed that after U.S. Bank paid ALC and ALC paid Libertyville, Libertyville would tender the MCOs.  Though U.S. Bank paid ALC for the vehicles, ALC never paid Libertyville and Libertyville never tendered the MCOs to ALC or U.S. Bank.  In August 2002, ALC went out of business.

After ALC went out of business, Cacciatore contacted Keefe, who indicated that Libertyville had never been paid for the vehicles.  Accordingly, Keefe refused to tender U.S. Bank the MCOs for the vehicles, which would enable U.S. Bank to obtain titles for the vehicles. Cacciatore assured Keefe that U.S. Bank would work with Libertyville to resolve the conflict. Thereafter, on August 30, 2002, without informing Libertyville of its actions, U.S. Bank filed documents with the Secretary of State seeking titles for the vehicles on the grounds that ALC was a "defunct dealer."  U.S. Bank did not inform the Secretary of State of Libertyville's competing

---

[1] Libertyville refers to the contracts between it and ALC as buyer's orders and notes that they do not indicate, as U.S. Bank's guidelines require, that U.S. Bank is the rightful owner of the subject vehicles.

ownership claims.

Six months later, U.S. Bank received titles for the six vehicles. Mueller testified that, had the Secretary of State known of Libertyville's claim of ownership, it would not have issued the titles and would instead have waited for a judicial order on the matter.

Meanwhile, also on August 30, 2002, U.S. Bank filed an action in the Northern District of Illinois against ALC in which it alleged that, though it had paid ALC for the vehicles, ALC had refused to pay Libertyville and Libertyville, in turn, had refused to turn over the MCOs for the vehicles. On April 4, 2003, U.S. Bank entered a consent judgment in that case. Neither party has cited to where in the record a copy of the consent judgment may be found. Moreover, neither offers an explanation of the substance of the consent judgment. However, in its brief and at oral argument, U.S. Bank maintained that it had never been paid or otherwise received a benefit pursuant to the consent judgment. Libertyville does not contest this assertion.

Following trial, the circuit court found that, at the time that possession of the vehicles was transferred from Libertyville to ALC, the parties intended that ownership of the vehicles also transfer to ALC. Accordingly, ALC had voidable title to the vehicles. Under section 2-403(1) of the UCC, ALC therefore had the power to transfer title to a good-faith purchaser. The court found U.S. Bank to meet the definition of good-faith purchaser at the time of the sale. Accordingly, the court found for U.S. Bank. Libertyville filed a timely notice of appeal.

Libertyville contends that the trial court erred in finding that the transaction between ALC and U.S. Bank met the requirements of section 2-403(1) of the UCC, which provides:

"A purchaser of goods acquires all title which his transferor had or had power to

transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser*." (Emphasis added.) 810 ILCS 5/2-403(1) (West 2004).

First, Libertyville argues that the court's determination that Libertyville and ALC intended that ownership of the vehicles was transferred with possession was contrary to the manifest weight of the evidence. Therefore, Libertyville argues, ALC did not have title to transfer to U.S. Bank pursuant to section 2-403(1).

"Under established law in Illinois, it is clear that although the Illinois Vehicles Code requires a transfer of certificate of title to effectuate the sale of a vehicle [citation], it is not necessarily determinative of the passage of ownership. [Citation.] It is the intent of the parties involved, and not such statutory prerequisites which determine ownership. [Citations.] Consequently, it is possible that one can own an automobile even though the certificate of title is in the name of another." Dan Pilson Auto Center, Inc. v. DeMarco, 156 Ill. App. 3d 617, 620-21 (1987).

See 625 ILCS 5/3-112(a) (West 2004). The trial court's determination of whether the parties intended to transfer ownership of the vehicles is factual and will not be overturned unless it is contrary to the manifest weight of the evidence. Dan Pilson, 156 Ill. App. 3d at 620.

Libertyville argues that the facts of this case are comparable to the facts of Dan Pilson and Nudi Auto RV & Boat Sales, Inc. v. John Deere Insurance Co., 328 Ill. App. 3d 523 (2002).

In Dan Pilson, the plaintiff, a motor vehicle dealer, brought an action to recover possession of six vehicles from the defendant, the sheriff of Sangamon County. The plaintiff had entered an oral contract to sell the vehicles to Fleet Automotive (Fleet), another motor vehicle dealer. Fleet then contracted to sell the vehicles to the defendant. The plaintiff and Fleet agreed that when the vehicles arrived at the plaintiff's dealership, Fleet would inspect them, and if it approved, the plaintiff and Fleet would exchange the vehicles' titles and possession for a cashier's check. The vehicles were late in arriving so Fleet arranged for the defendant to pick them up from the plaintiff. When the defendant took possession of the vehicles, he did not pay the plaintiff and did not receive the vehicles' titles. The defendant was aware that the plaintiff had not been paid for the vehicles. The court held that, though possession had been surrendered, the parties understood that the sale was not complete without the exchange of payment and the titles to the vehicles. Accordingly, though possession of the vehicles passed to the defendant, the plaintiff and Fleet did not intend ownership of the vehicles to pass at that time.

In Nudi, an automobile broker contracted to buy certain vehicles from an auction house intending to sell the vehicles to the plaintiff, an automobile dealer, and then pay the auction house with the payment from the plaintiff. Though the plaintiff paid the broker, the broker never paid its debt to the auction house. The plaintiff made a claim against the defendant, its insurance company, under a provision of its insurance policy that covered losses suffered if the plaintiff acquired a vehicle from a seller who did not have "legal title." Nudi, 328 Ill. App. 3d at 533. The court held that the question was not, as the defendant argued, whether ownership passed to the broker but whether legal title, as defined in the insurance policy, passed. The court found the

7

defendant's concession that the plaintiff "did not receive actual physical title [was] fatal to its case," and further found that the auction house clearly did not intend to transfer legal title to the broker without receiving payment. Nudi, 328 Ill. App. 3d at 533.

U.S. Bank compares the case before the court to Central National Bank of Mattoon v. Worden-Martin, Inc., 90 Ill. App. 3d 601, 604 (1980). In Central National Bank, possession of certain vehicles was transferred from an auction house to a dealer upon the dealer's promise of later payment. The Central National Bank court found the transaction between the auction house and dealer to be a credit sale and therefore found that the parties intended that ownership pass with possession.

We agree with U.S. Bank that the facts of this case are similar to those of Central National Bank and distinguishable from those of Dan Pilson. In this case, Libertyville and ALC entered written contracts memorializing the sale of the subject vehicles from Libertyville to ALC. By their own terms and as was Keefe's understanding, those contracts bound ALC to purchase the vehicles, though ALC had yet to pay for them. Also by their own terms, the contracts constituted the entire agreement between the parties. The contracts did not indicate that ownership would transfer from Libertyville to ALC only upon ALC's payment for the vehicles as was the explicit arrangement in Dan Pilson. Instead, in effect, as in Central National Bank, in exchange for ownership of the vehicles, ALC promised to pay their purchase price at a later time. This conclusion is supported not only by the contracts and Keefe's testimony regarding his understanding of Libertyville and ALC's arrangement but also by those parties' course of conduct. As was custom between the parties, when Libertyville agreed to sell and ALC agreed to

8

buy certain vehicles, Libertyville transferred possession of the vehicles to ALC but did not require contemporaneous payment, instead allowing ALC to pay for the vehicles up to 45 days after taking possession. While Keefe testified that Libertyville did not intend at that time to transfer ownership of the vehicles, the substance of the contract, Keefe's own testimony regarding his understanding of the contract and the parties' practice would belie this testimony.[2]

Moreover, though not indicative of the plaintiff and Fleet's intent, we find it significant that in Dan Pilson, the defendant was aware that the plaintiff had not been paid for the vehicles and therefore arguably had reason to believe that Fleet could not transfer ownership. On the contrary, in this case, at the time it purchased the subject vehicles from ALC, U.S. Bank was unaware of whether ALC had paid Libertyville for the vehicles. Cacciatore testified that U.S. Bank believed ALC to be the vehicle's rightful owner because ALC possessed the vehicles and had presented signed contracts purporting to sell the vehicles to ALC.

Finally, we observe that Nudi is simply inapposite to the case at bar, in that it concerned the construction of the term "legal title" in an insurance policy, rather than a determination of the parties' intent to transfer ownership.

---

[2] Carr, Lisle's general sales manager, testified that Lisle would allow ALC to take possession of a vehicle and show it to a customer. If the customer did not approve of the vehicle, ALC could return the vehicle to Lisle. Because Lisle did not appeal the trial court's findings, we need not assess whether, considering this testimony, the court's findings as to Lisle were contrary to the manifest weight of the evidence. We simply note that no similar testimony was offered concerning Libertyville and ALC's arrangement.

For these reasons, we cannot say that the trial court's determination that the parties intended ownership of the vehicles at issue to transfer to ALC when ALC took possession of those vehicles was contrary to the manifest weight of the evidence.

Next, Libertyville argues that U.S. Bank was not a good-faith purchaser. If this were the case, the transaction between ALC and U.S. Bank would not meet the requirements of section 2-403(1) of the UCC.

Under the UCC, " '[g]ood faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."[3]  810 ILCS 5/2-103(1)(b) (West 2004).  A determination of whether a party acted in good faith is factual and will not be overturned unless against the manifest weight of the evidence. Franz v. Calaco

---

[3] The standard of good faith to which a merchant is held is higher than that of a non-merchant.  The UCC defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction. " 810 ILCS 5/2-104(1) (West 2004).  Here, U.S. Bank is clearly a merchant in that the record shows that it has knowledge or skill particular to the transactions in question because it has a history of conducting such transactions and has instituted written procedures for conducting such transactions.  See Bank One, Milwaukee, N.A. v. Loeber Motors, Inc., 293 Ill. App. 3d 14, 23 (1997) (finding Bank One to be a merchant when it had been engaged in the business of leasing automobiles for several years and had checklists and procedures for approving such transactions).  In its brief, U.S. Bank implicitly agrees with this conclusion.

Development Corp., 352 Ill. App. 3d 1129, 1152 (2004).

Libertyville argues that U.S. Bank acted in bad faith when it failed to follow its own funding guidelines, which required it to obtain the MCOs for the vehicles or buyer's orders indicating that U.S. Bank was the owner of the vehicles prior to funding its transactions with ALC, and when it misled the Secretary of State in order to obtain certificates of title for the vehicles. However, "good faith" requires only the observance of "reasonable commercial standards" (810 ILCS 5/2-103(1)(b) (West 2004)), not that U.S. Bank strictly comply with its own funding guidelines. Moreover, while U.S. Bank certainly may not have been acting in good faith when Cacciatore filed arguably misleading documents with the Secretary of State to obtain certificates of title to the vehicles or when he assured Keefe that they would work together to resolve their conflict just before filing those documents, at that point, the transaction between ALC and U.S. Bank had already been completed. See C. Jon Development Corp. v. Pand-Rorsche Corp., 69 Ill. App. 2d 469, 475 (1966) (buyer acted in good faith at the time he took title to the vehicle; "[e]vents occurring thereafter have no relevance" in determining whether he acted in good faith).

Furthermore, as discussed above, at the time of the transaction between ALC and U.S. Bank, U.S. Bank had obtained signed contracts which indicated that ALC had purchased the vehicles from Libertyville. Cacciatore testified that, at that time, U.S. Bank was not aware of whether Libertyville had been paid for those vehicles, but, by virtue of the contracts and the fact that ALC possessed the vehicles, U.S. Bank believed ALC to be the vehicles' rightful owner. Given these facts, we cannot say that the trial court's determination that U.S. Bank acted in good

No. 1-05-4079

faith under section 2-403(1) of the UCC was contrary to the manifest weight of the evidence.

Having determined that the court did not err in finding that the sale of the vehicles to U.S. Bank was proper under section 2-403(1) of the UCC, we need not address the contention that the sale did not fall under the auspices of section 2-403(2) of the UCC.

Finally, Libertyville argues that U.S. Bank is judicially estopped from claiming ownership of the vehicles.

> "The doctrine of judicial estoppel postulates that 'a party who assumes a particular position in a legal proceeding is estopped from assuming a contrary position in a subsequent legal proceeding.' [Citation.] The purpose of the doctrine is 'to promote the truth and to protect the integrity of the court system by preventing litigants from deliberately shifting positions to suit the exigencies of the moment.' [Citation.] The five elements necessary for the application of judicial estoppel include the following: 'the party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intended for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it.' " Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi, 342 Ill. App. 3d 453, 460 (2003), quoting People v. Caballero, 206 Ill. 2d 65, 80 (2002).

Application of the judicial estoppel doctrine is reviewed for an abuse of discretion. Barack, 342 Ill. App. 3d at 459.

12

Libertyville asserts that U.S. Bank is judicially estopped from asserting ownership of the subject vehicles because it took factually inconsistent positions in the United States District Court and before the Secretary of State.

First, we observe that in its brief, Libertyville fails to cite authority supporting its assertion that U.S. Bank's acquisition of certificates of title to the vehicles from the Secretary of State was a judicial or quasi-judicial proceeding. See 210 Ill. 2d R. 341(e)(7); People v. Karim, 367 Ill. App. 3d 67, 96 (2006) (arguments presented in an appellate brief that are not supported by relevant authority are waived). We also observe that both in this case and before the Secretary of State, U.S. Bank took the same position: that it was the owner of the subject vehicles.

Moreover, Libertyville has not sufficiently proven that the position U.S. Bank took before the federal court and the position that it takes in this proceeding are factually inconsistent. In its complaint before the United States District Court, U.S. Bank alleged, *inter alia*, that because ALC had not paid third-party dealers, including Libertyville, the dealers had refused to tender the vehicle titles "despite U.S. Bank's clear interest in, and lien on, the Vehicles and the third party dealerships' lack of legal title to the Vehicles" and that, as a result of ALC's actions, U.S. Bank was "completely unable to affix or otherwise secure its valid and enforceable first priority security interest in the Vehicles." Put another way, U.S. Bank alleged that it had a security interest in the vehicles. In U.S. Bank's answer to Libertyville's complaint in the case underlying this appeal, it alleged that it was the "legal and rightful" owner of the vehicles. Put another way, it alleged that it had an ownership interest in the vehicles. Libertyville has failed to cite authority supporting its assertion that these two positions are inconsistent. See 210 Ill. 2d R. 341(e)(7);

13

Karim, 367 Ill. App. 3d 67 at 96.

Regardless of whether those positions are inconsistent, Libertyville has failed to demonstrate that U.S. Bank succeeded and received a benefit in the proceeding before the federal court. As noted above, we observe that neither party has cited where in the voluminous record the consent judgment may be found. Accordingly, the substance of the judgment is unknown. As also noted above, U.S. Bank claims, and Libertyville does not dispute, that U.S. Bank never received any money pursuant to the consent judgment.

Accordingly, we find that Libertyville has simply failed to prove all five elements necessary for the application of the judicial estoppel doctrine and therefore we cannot say that the trial court erred in determining that the doctrine did not apply.

For the above-stated reasons, we affirm the judgment of the trial court.

Affirmed.

THEIS, P.J., and CUNNINGHAM, J., concur.