2026 IL App (1st) 241997-U

No. 1-24-1997

Order filed January 13, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| GARY MOTYKIE, M.D. and MOTYKIE MED SPA OF ILLINOIS, SC, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 22 CH 848 |
| KEVIN MOTYKIE, | ) ) ) | Honorable Alison C. Conlon |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's judgment over defendant's contentions that it creates piecemeal litigation and is substantively unconscionable. We also affirm the court's rulings regarding ownership of certain classic cars over defendant's contentions that they are against the manifest weight of the evidence and the trial court erred in imposing a constructive trust.

¶ 2    This case arises from two estranged brothers' disputes regarding several classic cars, a life insurance policy, and a spa business's assets. Following a bench trial, the trial court entered partial

judgment in favor of plaintiff Gary Motykie and against his brother, defendant Kevin Motykie.[1] The court found that Gary and his spa business owned four of the cars at issue and ordered Kevin to return those cars to Gary. On appeal, Kevin argues that the trial court's judgment creates improper piecemeal litigation and is substantively unconscionable. He also contends that several of the trial court's rulings regarding the cars are erroneous. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Complaint

¶ 5      The complaint alleged that Gary is a plastic surgeon who primarily resides in southern California but maintains family and business ties with the Chicago area. Gary's complaint alleged that, in 2017, he hired Kevin to manage one of Gary's businesses, Motykie Med Spa (Med Spa) in Barrington, Illinois. During the COVID-19 pandemic, Gary could not regularly travel to Illinois to supervise Med Spa, and Kevin used that opportunity to embezzle Med Spa funds. In 2021, before Gary discovered Kevin's embezzlement, the brothers agreed that Kevin would purchase classic cars on Gary's behalf to resell at auction. Using funds Gary provided, Kevin purchased several cars, including three Ford Mustang Shelbys. Kevin also bought two Pontiac GTOs, at least one of which he bought using funds he embezzled from Med Spa.

¶ 6      In November 2021, Gary discovered Kevin's embezzlement and that he had not titled any of the cars in Gary's name. Following a confrontation, Gary fired Kevin as Med Spa's manager. Kevin refused to give the cars to Gary. In December 2021, Gary obtained an emergency order of protection, which found that he owned the cars and prohibited Kevin from selling them.

---

[1]Gary's business, Motykie Med Spa of Illinois, is also a plaintiff. Generally, we refer to Gary Motykie and Kevin Motykie by their first names. We refer to Motykie Med Spa separately where appropriate.

¶ 7    Gary pleaded four counts that proceeded to trial. Count I sought a declaratory judgment that Gary owned the cars. Count II sought replevin of the cars. Count III sought, as an alternative to count II, damages for Kevin's conversion of the cars. Count IV sought damages for Kevin's conversion of Med Spa funds. In this appeal, Kevin challenges only the trial court's rulings in Gary's favor on counts I and II.

¶ 8                                      B. Trial

¶ 9    The case proceeded to a bench trial. For brevity, we focus on the evidence relevant to the issues Kevin raises on appeal.

¶ 10                                  1. Gary Motykie

¶ 11    Gary testified that he is a plastic surgeon who opened a medical practice in Los Angeles in 2005. In 2008, Gary hired Kevin as a business consultant for the practice.

¶ 12    In 2009, Kevin suggested that the brothers take out a life insurance policy for Kevin's son Max as an "investment" to fund his college education.[2] A March 30, 2009, email between Gary, Kevin, and their financial advisor stated that the policy would be "a gift from Gary" to pay for Max's college tuition. On June 1, 2009, Kevin took out the life insurance policy through New York Life Insurance Company. A copy of the policy admitted into evidence stated that Kevin was the owner of the policy, Max was the insured, Kevin was the primary beneficiary, and Gary was the secondary beneficiary. Gary moved into evidence checks showing that, between 2010 and 2018, he paid $85,163.49 in premiums for Max's life insurance policy.

---

[2]This life insurance policy is relevant to how Kevin funded the purchase of one of the Mustang Shelbys.

¶ 13     In the summer of 2013, Kevin was struggling with substance abuse, his work performance suffered, and he was causing legal and financial problems for Gary's Los Angeles medical practice. Gary sent Kevin back to the Chicago area and bought a home in Schaumburg for Kevin, Max, and Max's mother to live in. After several years, the brothers' relationship improved. In the spring of 2017, Gary opened Med Spa in Barrington and hired Kevin as the manager.

¶ 14     In 2019 or 2020, at Gary's request, Kevin bought a Maserati as a "business car" for Gary to use when he visited the Chicago area. Kevin was supposed to title the Maserati to Med Spa, but he titled it under his own name instead.

¶ 15     When the COVID-19 pandemic began in 2020, Gary got "stuck" in Los Angeles and could not travel to Illinois. He returned to Illinois in August 2020 and found that Kevin's work performance was suffering as it had in Los Angeles. In late 2020 or early 2021, Gary shifted Kevin's focus to investing in classic cars. The brothers agreed that Kevin would buy classic cars in Gary's name, Gary would own them, Kevin would increase their value through car shows, commercials, and movies, and then they would resell the cars for profit. The brothers began this venture in March 2021 and informally named it "Scalpels and Wrenches." Gary and Kevin discussed that company name in a text message, which Gary moved into evidence.

¶ 16     Following these discussions, Gary asked his attorney Daniel Cooper "to start forming the paperwork for the car corporation." Cooper planned to create one corporation "that held the cars, and [a] second corporation that was going to be leasing the cars out or arranging *** to have them in movies." Over the next several months, Cooper emailed Gary and Kevin about the corporate structure and requested information about the cars Kevin was buying for the business. Kevin did

not respond, so Cooper never incorporated the car business. Nevertheless, Kevin and Gary went ahead with the business based on their oral agreement.

¶ 17    When Kevin bought cars for Scalpels and Wrenches, Gary transferred funds to Med Spa's account and Kevin paid the sellers from that account. Gary did so to "to keep a record of where the money was going." On February 11, 2021, Gary transferred $80,200 to Med Spa's account to buy a 1968 Mustang Shelby (the first Shelby).[3] A bank statement in evidence reflects this transfer on that date from Gary's account to Med Spa's account.

¶ 18    Unbeknownst to Gary, in April 2021, Kevin purchased another Shelby (the second Shelby). Gary saw the second Shelby during a trip to Illinois in May or June of 2021 and asked Kevin how he paid for it. Kevin said that a friend loaned him money. However, Kevin actually paid for the second Shelby by "cash[ing] in" Max's life insurance policy, which Gary did not know about or authorize. Insurance documents in evidence reflect that Kevin took out a loan against Max's life insurance policy on April 13, 2021, which provided $109,389 after fees. Bank records show that Kevin deposited the loan proceeds in Med Spa's account and then paid for the second Shelby from that account. A bill of sale in evidence reflects that Kevin bought the second Shelby from Gas Monkey Garage in Dallas, Texas on April 14, 2021, for $110,000.

¶ 19    On May 20, 2021, Gary transferred $157,500 to Med Spa's account to purchase another Shelby (the third Shelby). A bill of sale in evidence reflects that Kevin bought the third Shelby from a Gene Mullowney on May 25, 2021, for $157,500. Bank records show that, the same day, Kevin wired Mullowney money from Med Spa's account to pay for the third Shelby. Gary never

---

[3]The parties and the trial court referred to these cars as the first, second, and third Shelbys. For consistency, we adopt that terminology.

told Kevin that any of the three Shelbys were gifts to him and never told him that the cars were "a benefit of his employment" at Med Spa.

¶ 20    In August 2021, Kevin became evasive and argumentative when Gary asked him for the Shelbys' certificates of title. Gary also discovered that Kevin had somehow bought himself two Pontiac GTOs. Kevin told conflicting stories about how he paid for the Pontiacs. During the Thanksgiving holiday, Gary again asked Kevin for the Shelbys' certificates of title and confronted him about embezzling from Med Spa. Kevin screamed at Gary and threatened to kill him. Gary obtained an order of protection against Kevin in December 2021.

¶ 21    In late 2021 and early 2022, Gary reviewed Med Spa's bank records and discovered that Kevin had used Med Spa funds to pay for personal expenses including trips, meals, and medical and legal bills. Gary prepared a spreadsheet with approximately 4,000 entries reflecting that Kevin used Med Spa funds to pay for more than $458,000 in unauthorized personal expenses. Gary moved this spreadsheet into evidence at trial.

¶ 22                                2. Alexis Portugal

¶ 23    Alexis Portugal testified that she was Med Spa's accountant. When Kevin was the spa manager, he provided Portugal with Med Spa's bank statements so she could prepare the business's financial statements. One bank statement reflected a large expense for a Maserati, which Kevin bought using Med Spa funds. Kevin told Portugal the Maserati was for Gary to use when he was in town. Portugal explained to Kevin that because the Maserati was for business use, Med Spa should be on its title. Portugal asked Kevin for the Maserati's bill of sale, but he never provided it to her.

¶ 24                                3. Sarah Sharp

¶ 25 Sarah Sharp testified that she met Kevin in April 2021 when he provided a Mustang Shelby that Sharp used in a film she was producing. Kevin did not explicitly claim that he owned the Shelby, but "there was never anything brought up otherwise as to lead [Sharp] to believe that it was owned by anyone outside of Kevin." In April 2022, Gary emailed Sharp requesting proof that she used the Shelby in the film "because they were looking to sell the car and wanted to use that as a point [to] raise [its] value." Sharp provided such documentation to Gary.

¶ 26                                4. Kevin Motykie

¶ 27 Kevin testified that he is Gary's older brother. In 2009, Kevin took out a New York Life insurance policy to provide a "rainy day" or college fund for his son Max. Kevin owned the policy. Gary paid the policy premiums as part of Kevin's compensation for working at the Los Angeles medical practice. Gary took "tax write-off[s]" for those payments as gifts to Max but had "[z]ero" "ownership interest" in the policy.

¶ 28 On May 22, 2020, Kevin withdrew $16,000 from Med Spa's account to buy a Maserati, which Gary authorized. Kevin told Portugal the Maserati was a "business car." Kevin acknowledged that he titled the Maserati in his name instead of the business's name "[e]ven though it was purchased 100 percent with Motykie Med Spa of Illinois funds."

¶ 29 In February 2021, Kevin and his girlfriend Katherine Torbick traveled to Brownsville, Texas, to buy the first Shelby for $80,200. Gary agreed to wire money from Kevin's retirement account to his personal bank account to pay for the car. However, when Kevin arrived in Texas, Gary refused to wire Kevin's money. Kevin and Gary exchanged text messages about this dispute. On February 9, 2021, Kevin texted Gary, "I by no means mean that yell at you. I literally a be

exhausted, bro. I know how much you are helping us on this and I appreciate it."[4] Kevin denied that this text message referred to Gary "helping" him start a car business.

¶ 30     Kevin testified that he made an $8,000 down payment on the first Shelby from his "savings, extra money[,] salary," and proceeds from the sale of two motorcycles. On February 11, 2021, Gary wired $80,200 to the Med Spa account. Kevin then paid the seller of the Shelby the balance of $72,200 and "reimbursed" himself for the $8,000 down payment. The first Shelby's bill of sale bore only Kevin's name. In April 2021, Kevin transported the first Shelby from Texas to Illinois.

¶ 31     While transporting the first Shelby to Illinois, Kevin stopped in Dallas and bought the second Shelby for $110,000. Kevin took out a $110,000 loan against Max's life insurance policy, deposited the loan proceeds in Med Spa's account, and then paid for the second Shelby with those funds. In late April 2021, Kevin had the second Shelby shipped to Illinois. Gary was not involved in buying the second Shelby or obtaining the loan.

¶ 32     On May 10, 2021, Kevin texted Gary that he had spoken to a man named Gene about buying a third Shelby. Kevin acknowledged that he texted Gary because he "wanted [Gary] to wire money so that [Kevin] could purchase that car with funds from [Gary]." On May 25, 2021, Kevin bought the third Shelby from Gene Mullowney for $157,500. Only Kevin's name is on the bill of sale for the third Shelby.

¶ 33     Gary's name was not on any documents related to the three Shelbys. According to Kevin, Gary had no role in those purchases aside from wiring Kevin his own money. Kevin denied that

---

[4]Although the text messages were entered into evidence at trial, they do not appear to be in the record on appeal. Gary's attorney quoted the text messages during Kevin's cross-examination. We reproduce the text messages exactly as they appear in the reports of proceedings without correcting typographical errors.

he and Gary had an agreement regarding how to title the Shelbys, denied that they discussed forming a company to buy and resell cars, and denied the existence of any business called Scalpels and Wrenches. Kevin testified that he did not title any of the three Shelbys in anyone's name because adding names to a car's title reduces its value. Specifically, he testified as follows:

"Q. This Shelby that you purchased in February and recovered in April 2021, what name was that title in?

A. No, it's not been titled.

Q. Pardon me.

A. All five cars in this case have never been titled.

Q. Why?

A. For the same reason that I've always employed is that when I buy a car like this, you don't title it because it drops the value in the car dramatically ***.

The more owners that are on a car history—you always want to get an original owner car. As you add names, it devalues it."

¶ 34                                    5. Katherine Torbick

¶ 35    Katherine Torbick, Kevin's girlfriend, testified that Kevin bought three Shelbys for himself using "his funds." When Kevin was trying to buy the first Shelby, he became frustrated because Gary delayed sending Kevin money that belonged to him. Kevin bought the second and third Shelbys no later than July 2021 and kept them in a garage at his Inverness residence. The bills of sale for all three Shelbys were in Kevin's name.

¶ 36                                    C. Findings and Judgment

¶ 37    The trial court issued written findings of fact and conclusions of law. Relevant here, the court found that "the New York Life insurance policy was procured by Gary for the benefit of Max" and not "as compensation for Kevin, as a gift to Kevin, or for any other benefit to Kevin." The court explained that Gary's testimony about the life insurance policy was "consistent, credible and unequivocal" and showed his intent "to use the policy proceeds to take care of his nephew Max." The court "observed Gary's strong feelings of love and protectiveness toward Max which were evident in Gary's words and demeanor." Furthermore, written communications from a financial advisor "describ[ing] the policy as a gift from Gary for Max's benefit" corroborated Gary's account, and checks showed that Gary paid nine annual premiums for the life insurance policy. The court concluded that

>           "[i]t was wrong of Kevin to (a) name himself as the owner of the policy, without Gary's knowledge or consent; (b) sell the policy, without Gary's knowledge or consent; (c) use the sale proceeds to purchase the Second Shelby, without Gary's knowledge or consent; and (d) deprive Max (his son) of the benefit of those proceeds.
>
>           *** Kevin knew his conduct was wrongful, as demonstrated by his concealment of the source of the purchase funds [for the second Shelby] when Gary asked him. Rather than telling Gary the truth—that he used the New York Life insurance policy proceeds that were for Max's benefit—Kevin lied to Gary and told him he received a loan from a friend. Kevin's wrongful conduct is also demonstrated by his prior acknowledgements, orally and in writing, that the policy was a gift for Max's benefit."

The court reasoned that, "[g]iven Kevin's wrongful conduct in purchasing the Second Shelby with funds that were agreed to be for Max's benefit, Kevin should not have any possessory right in the

Second Shelby." The court found that Gary owned the second Shelby for Max's benefit and placed the car in a constructive trust as a remedy for Kevin's unjust enrichment by taking out a loan against Max's life insurance policy and using it to buy the second Shelby for himself.

¶ 38    The court also found that Gary owned the first and third Shelbys, reasoning that "Gary paid for the First and Third Shelbys with his personal funds" and those cars were not part of Kevin's compensation or gifts to him. The court explained that

"Gary testified, credibly, that he intended to set up a car corporation and treat the cars as an investment. He came up with a name for the corporation. He consulted an attorney for advice on this commercial endeavor. In other words, the evidence shows that Gary's intent was commercial, not donative.

*** Moreover, the evidence shows that Kevin knew Gary's intent was commercial, not donative. Kevin acknowledged both the car company concept and the name. [Exhibit citation]. Kevin was included in at least one email with Gary and the attorney about setting up the corporation. [Exhibit citation]. In writing, Kevin used the plural possessive pronoun 'we' to refer to the Shelbys' ownership. [Exhibit citation]. These facts establish that Kevin did not behave as a donee."

¶ 39    The court next found that Med Spa owned the Maserati. The court acknowledged that Kevin titled the Maserati in his name, which gave rise to a presumption of ownership. However, Gary overcame that presumption "by showing by a preponderance of the evidence that [Med Spa] is the rightful owner of the Maserati." The court reasoned that

"Kevin located and purchased the Maserati at Gary's request for use related to the business of [the Med Spa]. It is undisputed that the brothers agreed that Gary would use it

to commute to and from his work at [the Med Spa]. Kevin told Portugal that the Maserati was used for business purposes. And Kevin indicated in writing on the annotated bank statement that the Maserati was a 'Business Car.' "

¶ 40   The court found that Gary failed to prove he owned the Pontiac GTOs because he could not identify the source of funds Kevin used to buy those cars. Finally, the court found that Gary failed to prove that Kevin converted Med Spa funds because (1) Gary was unqualified to prepare the spreadsheet documenting Kevin's unauthorized expenses, (2) that spreadsheet was "based on assumptions and speculation, rather than evidence," (3) Alexis Portugal's testimony indicated that Kevin's use of Med Spa funds for personal expenses was authorized to at least some degree, and (4) if anything, Kevin owed Med Spa money as a debtor for advances on his salary; he did not convert those funds.

¶ 41   The court entered partial judgment for Gary, finding that he owned all three Shelbys and ordered Kevin to return the Shelbys to Gary by September 14, 2024. The court found that Med Spa owned the Maserati and ordered Kevin to return it to Gary by September 14, 2024, as well. The court entered judgment for Kevin on the count alleging conversion of Med Spa funds. Finally, the court found that, pursuant to Supreme Court Rule 304(a) (eff. March 8, 2016), there was "no just reason for delaying either enforcement or appeal" of its judgment.

¶ 42                    D. Posttrial Proceedings

¶ 43   Kevin filed a motion to reconsider, which argued that the trial court's finding that Gary owned the Shelbys was against the manifest weight of the evidence. According to Kevin, all documents relating to the Shelbys, including their certificates of title, bills of sale, and insurance policies were in Kevin's name only, proving that he owned the cars. Kevin contended that Gary

lent him funds to buy the Shelbys but did not own any of them. In addition, Kevin argued that the trial court's imposition of a constructive trust over the second Shelby violated the five-year statute of limitations for such a remedy, and Gary's complaint did not seek a constructive trust anyway. Finally, Kevin contended that the court erred in awarding the Maserati to Med Spa because the complaint did not allege anything about that car.

¶ 44 The trial court denied Kevin's motion to reconsider, but it also ordered the parties to submit filings clarifying "whether titles to the Shelby Mustangs were admitted as evidence at trial." Gary's filing simply stated that "no titles were offered or admitted" at trial. Kevin's filing asked the court to "excuse the fact that the titles were not entered into evidence" and to reopen the proofs to admit evidence of the titles. In response, Gary argued that Kevin's position was contrary to his own trial testimony, which stated that he did not title any of the Shelbys because doing so would reduce their value. The court found that Kevin had conceded that his name was not on any of the Shelbys' titles and that "the titles were not offered or admitted into evidence at trial."

¶ 45 Kevin timely appealed.

¶ 46                                   II. ANALYSIS

¶ 47                                   A. Motion to Strike

¶ 48 Gary filed a motion to strike Kevin's brief's statement of facts. Gary contends that Kevin's statement of facts violates Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) because it presents his trial testimony, which the court found not credible, as "fact" and misstates the documentary evidence introduced at trial.

¶ 49 Rule 341(h)(6) requires the appellant's brief to include a statement of facts, "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without

argument or comment." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). This court may strike an appellant's statement of facts for violating Rule 341(h)(6). *John Crane, Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009). However, we will strike a statement of facts only if it "includes such flagrant improprieties that it hinders our review of the issues." *Id.*

¶ 50    Kevin's statement of facts is deficient in several respects. It focuses almost exclusively on Kevin's testimony even though four other witnesses testified about the issues Kevin raises on appeal, and their testimony is necessary to understand this appeal. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Additionally, Kevin's statement of facts is argumentative. For example, it contends that the trial court's findings of fact and conclusions of law are erroneous, and that Gary introduced "fake" emails as evidence. Argument in a statement of facts is improper. *Id.*

¶ 51    Kevin's statement of facts does not comply with Rule 341(h)(6), but that does not hinder our review. We can rely on our own review of the record, the trial court's findings, and Gary's statement of facts to resolve this appeal. Therefore, we will not strike Kevin's statement of facts. Rather, we will disregard arguments and "facts" the record contradicts or does not support. See *Wilson v. University of Chicago Medical Center*, 2023 IL App (1st) 230078, ¶ 17. Accordingly, we deny Gary's motion to strike.

¶ 52    We now turn to Kevin's arguments, which fall into two groups. The first group contends that the trial court's judgment as a whole is improper. The second group contends that several of the trial court's specific rulings are erroneous.

¶ 53                           B. Propriety of the Judgment

¶ 54    Kevin argues that the trial court's judgment is improper because it creates piecemeal litigation and is substantively unconscionable.

¶ 55                                    1. Piecemeal Litigation

¶ 56    Kevin first contends that the trial court's judgment creates impermissible piecemeal litigation.

¶ 57    The declaratory judgment statute provides that "[t]he court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a) (West 2022). This language exists to prevent piecemeal litigation, which the declaratory judgment statute does not allow. *Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 27. Piecemeal litigation occurs when a plaintiff seeks a declaratory judgment as to certain issues or elements related to the same claim rather than judgment as to the entire claim. *Id.* ¶¶ 27-31. For example, if a plaintiff seeks a declaratory judgment as to which legal standard governs a claim, that is impermissible piecemeal litigation. *Id.* As another example, a declaratory judgment seeking a finding that the defendant's design of a car was defective is improper piecemeal litigation because it resolves only one element of a negligence claim and leaves the elements of causation and damages unresolved. *Marlow v. American Suzuki Motor Corp.*, 222 Ill. App. 3d 722, 730-31 (1991).

¶ 58    Piecemeal litigation can affect appellate jurisdiction as well. When the trial court disposes only of certain issues related to the same claim and then attempts to make its partial ruling appealable pursuant to Supreme Court Rule 304(a) (eff. March 8, 2016), we lack jurisdiction. *Armstead v. National Freight, Inc.*, 2021 IL 126730, ¶ 24. If Kevin is correct, then the trial court's inclusion of Rule 304(a) language was ineffective, and we may lack jurisdiction over this appeal. Kevin's position is puzzling given that he is the appellant, but we must address it as it raises a potential jurisdictional issue. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill.

2d 209, 213 (2009) (a reviewing court must consider its own jurisdiction regardless of whether or how the parties raise the issue).

¶ 59 In this case, the trial court found that Gary owned all three Shelbys and Med Spa owned the Maserati, and it ordered Kevin to return those cars to Gary. The court also found that neither Gary nor Med Spa owned the Pontiac GTOs. So, the court resolved count I by declaring ownership of the cars and count II by ordering replevin of the cars as appropriate. Count III alleging conversion of the cars was merely an alternative to count II; if Gary could not obtain the cars themselves, he sought damages as compensation for them. Finally, the court resolved count IV by entering judgment in Kevin's favor on Gary's claim for conversion of Med Spa funds. Therefore, the court's judgment resolved at least three, if not all four counts of Gary's complaint and did not create piecemeal litigation. See *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 204 (1993) (relief that disposes of at least one claim in its entirety does not result in piecemeal litigation).

¶ 60 The trial court's judgment was final because it terminated the litigation between the parties on the merits and disposed of the parties' rights, either on the entire controversy or a separate part thereof. See *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159 (1998). Therefore, we have jurisdiction under Supreme Court Rule 303 (eff. July 1, 2017), which is the jurisdictional provision that Kevin's notice of appeal invokes. We need not rely on the trial court's inclusion of Rule 304(a) language.

¶ 61 Kevin contends that the trial court resolved only the issue of ownership and left him to pursue separate claims of "breach of a partnership or alternatively unjust enrichment." We disagree. As explained above, the trial court resolved more than just ownership; it resolved most

if not all of the claims that proceeded to trial. The fact that Kevin may have other claims he may wish to pursue in a separate case, or counterclaims he wished to pursue in this case, does not make declaratory judgment improper. See *AG Farms, Inc. v. American Premier Underwriters, Inc.*, 296 Ill. App. 3d 684, 692 (1998) ("the existence of another remedy does not preclude a declaratory judgment action.") (citing *La Salle National Bank v. Cook County*, 57 Ill. 2d 318, 322 (1974)). Accordingly, we find that the trial court's judgment did not create piecemeal litigation.

¶ 62                           2. Substantive Unconscionability

¶ 63    Kevin also contends that the trial court's judgment is substantively unconscionable. Substantive unconscionability is a contract law concept describing contract terms that are "so one-sided as to oppress or unfairly surprise an innocent party." (Internal quotation marks omitted.) *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 28 (2006). We have found no authority for the proposition that a court's judgment following a bench trial can be substantively unconscionable. Kevin cites no such authority. The only case he cites involved an unconscionable postnuptial agreement, which is not relevant here. See *In re Marriage of Iqbal and Khan*, 2014 IL App (2d) 131306, ¶ 41. Because Kevin fails to cite any authority supporting the conclusion that the trial court's judgment was, or even could be, unconscionable, we will not consider this argument. See *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 155 (arguments unsupported by legal authority are forfeited).

¶ 64                           C. Trial Court's Findings

¶ 65    In Kevin's second group of arguments, he challenges several of the trial court's factual findings and one legal remedy. First, Kevin contends the evidence established that he owns all

three Shelbys and the Maserati. Second, he argues that the trial court erred in placing the second Shelby in a constructive trust for Max's benefit.

¶ 66 The trial court entered a declaratory judgment that Gary owns all three Shelbys and Med Spa owns the Maserati. Section 2-701 of the Code of Civil Procedure allows a trial court to, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments." 735 ILCS 5/2-701 (West 2022). "The essential requirements of a declaratory judgment action are: (1) a plaintiff with a legal tangible interest; (2) a defendant having an opposing interest; and (3) an actual controversy between the parties concerning such interests." *Beahringer v. Page*, 204 Ill. 2d 363, 372 (2003). The trial court also awarded Gary replevin of the four cars that he and Med Spa own. To be entitled to replevin, a plaintiff must establish that (1) he is the owner or lawfully entitled to possession of the property, (2) the defendant is wrongfully detaining the property, and (3) the property has not been taken to satisfy any tax, assessment, or fine against the plaintiff. 735 ILCS 5/19-104 (West 2022).

¶ 67 Generally, we review a trial court's decision granting or denying a declaratory judgment for an abuse of discretion. *State Farm Mutual Automobile Insurance Co. v. Leon*, 2019 IL App (1st) 180655, ¶ 26. A court abuses its discretion when no reasonable person would adopt the trial court's view. *Id.* In this case, the trial court resolved the parties' disputes at a bench trial. In a bench trial, including a bench trial in which the plaintiff seeks declaratory relief, the court weighs the evidence and resolves issues of fact. *Nelson v. Brewer*, 2019 IL App (1st) 173143, ¶ 53. We defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* " 'A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence.' " *Id.* (quoting

*Samour, Inc. v. Board of Election Commissioners of City of Chicago*, 224 Ill. 2d 530, 544 (2007)). As explained below, we find that the trial court's factual findings were not against the manifest weight of the evidence, and its ultimate decision to enter partial declaratory judgment in Gary's favor was not an abuse of discretion.

¶ 68                                   1. Ownership of the Cars

¶ 69    Illinois courts consistently hold that the parties' intent is the critical factor in determining ownership of a car. *Libertyville Toyota v. U.S. Bank*, 371 Ill. App. 3d 1009, 1013 (2007).

> "Under established law in Illinois, it is clear that although the Illinois Vehicle Code requires a transfer of certificate of title to effectuate the sale of a vehicle [citation], it is not necessarily determinative of the passage of ownership. [Citation.] It is the intent of the parties involved, and not such statutory prerequisites which determines ownership. [Citations.] Consequently, it is possible that one can own an automobile even though the certificate of title is in the name of another." *Dan Pilson Auto Center, Inc. v. DeMarco*, 156 Ill. App. 3d 617, 620-21 (1987).

A certificate of title creates a *prima facie* presumption of ownership, but evidence of actual ownership can rebut that presumption. *Pekin Insurance Co. v. U.S. Credit Funding, Ltd.*, 212 Ill. App. 3d 673, 677 (1991). Evidence of actual ownership includes paying for the car, signing the bill of sale, and responsibility for car maintenance. *Dolan v. Welch*, 123 Ill. App. 3d 277, 281 (1984). Ownership of a car is a question of fact, and we will not overturn the trial court's determination regarding ownership unless it is against the manifest weight of the evidence. *Dan Pilson*, 156 Ill. App. 3d at 620; *Springfield Fire and Casualty Co. v. Garner*, 255 Ill. App. 3d 685, 689 (1993).

¶ 70    The only case regarding car ownership that Kevin cites is *People v. Tidwell*, 2017 IL App (1st) 150894-U. This citation is improper because unpublished decisions issued before January 1, 2021, are "not precedential except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." See Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025). More importantly, Kevin quotes the following language from *Tidwell* as if it were a principle of black-letter law: "Proof of ownership can be the car's title, registration, or a bill of sale." That is a quote from *Tidwell*, but it is the summarized testimony of an auto pound supervisor who listed the documents one can use to retrieve their car from impound. *Tidwell*, 2017 IL App (1st) 150894-U, ¶ 12. It is not, as Kevin claims, a "clear" principle of case law. This citation is unhelpful at best and misleading at worst. We reject this improper citation and proceed to review the trial court's findings regarding ownership of the three Shelbys and the Maserati.

¶ 71                                    a. Mustang Shelbys

¶ 72    Gary and Kevin's intent regarding the Shelbys is the most important factor in determining who owns those cars. See *Libertyville Toyota*, 371 Ill. App. 3d at 1013. The parties presented conflicting accounts of their intent. Gary testified that in early 2021, he and Kevin agreed to form a business in which Kevin would buy classic cars using Gary's funds, Gary would own the cars, Kevin would increase their value through car shows, commercials, and movies, and then the brothers would resell the cars for profit. Gary contacted his attorney about forming a corporation for this car business. Gary and his attorney included Kevin in those communications, suggesting that Kevin was aware of the business and its purpose. Although Gary and Kevin never incorporated the car business, they informally referred to it as "Scalpels and Wrenches." Gary testified that the Shelbys were not gifts to Kevin nor were they part of his compensation as Med Spa's manager.

¶ 73    By contrast, Kevin denied the existence of any such car business. Kevin claimed that he bought all three Shelbys for his personal use. However, Kevin admitted that he did not title any of the Shelbys in his name because doing so would reduce their value. That testimony suggested that Kevin planned to resell the cars, just as he and Gary agreed. Kevin's interactions with Sarah Sharp further supported an inference that he was trying to increase the Shelbys' value by featuring them in movies, just as he and Gary planned. This evidence supports the trial court's conclusion that the parties' intent "was commercial, not donative." The parties intended to form a car buying-and-reselling business, with Gary paying for and owning the cars and Kevin handling the transactions. The parties never intended for Kevin to own the Shelbys personally, as gifts, or as compensation. Accordingly, we find that the parties' intent weighs in favor of finding that Gary owns the Shelbys.

¶ 74    Other evidence specific to each car, which we now address, further supports the trial court's finding that Gary owns all three Shelbys.

¶ 75                                    i. First Shelby

¶ 76    The evidence established that Kevin bought the first Shelby in Brownsville, Texas on February 11, 2021, for $80,200. The parties dispute who provided the funds to purchase the first Shelby.

¶ 77    When a person provides funds to purchase a car, that is evidence he owns the car. *Garner*, 255 Ill. App. 3d at 689-90 (a buyer paying for a car indicates that ownership has passed to him whereas lack of payment indicates that ownership has not passed); *People ex rel. Birkett v. 1998 Chevrolet Corvette, VIN 1G1YY22G2W5108366*, 331 Ill. App. 3d 453, 462 (2002) (a party buying a car with her own funds is evidence she is "the true owner" even if another person "ostensibly retained some minimal interest as its titleholder.").

¶ 78    Gary testified that he funded Kevin's purchase of the first Shelby by depositing $80,200 in Med Spa's account on February 11, 2021. A bank statement in evidence corroborates that testimony. Kevin agreed that Gary wired those funds to Med Spa's account on that date and that he used them to pay for the first Shelby. However, Kevin claimed that the funds came from his retirement account, which Gary had "been managing for [Kevin] for 14 years" as part of his compensation. The trial court rejected that claim, finding that the first Shelby was not any "part of Kevin's compensation" for working for Gary. That conclusion is consistent with the court's broader rejection of Kevin's claim that Gary promised him $120,000 in "off the books" compensation, including the supposed retirement account. We defer to the trial court's credibility determinations. See *Nelson*, 2019 IL App (1st) 173143, ¶ 53. The straightforward conclusion is that Gary paid for the first Shelby, not that he sent Kevin an advance from an undocumented retirement account. Accordingly, the trial court's conclusion that Gary owns the first Shelby is not against the manifest weight of the evidence.

¶ 79                                    ii. Second Shelby

¶ 80    The evidence established that Kevin bought the second Shelby in Dallas, Texas in April 2021 for $111,000. Kevin funded that purchase by taking out a loan against Max's life insurance policy. Kevin transferred the loan proceeds to Med Spa's account and then paid for the second Shelby from that account. Only Kevin's name appears on the bill of sale for the second Shelby. At the time, Gary did not know about Kevin's purchase of the second Shelby or the loan against Max's life insurance policy. The parties agree on these facts.

¶ 81    Viewed in isolation, these facts seem to indicate that Kevin owns the second Shelby. He financed the purchase, only his name is on the bill of sale, and Gary was not aware of or involved

in the purchase. However, because this dispute concerns ownership of a car, the parties' intent is the decisive factor. See *Libertyville Toyota*, 371 Ill. App. 3d at 1013. Kevin bought the second Shelby by taking out a loan against Max's life insurance policy. There is no dispute that the parties intended Max's life insurance policy to be a gift from Gary to Max, not a gift to Kevin. "A gift is a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee." *Estate of Poliquin*, 247 Ill. App. 3d 112, 115 (1993). Here, Gary demonstrated his donative intent toward Max by paying premiums totaling $85,163.49 for Max's life insurance policy.

¶ 82    If a child is the beneficiary of a life insurance policy, the child's parent cannot take out a loan against the policy and keep the proceeds for him or herself. *Morton v. Morton*, 2025 IL App (1st) 240777-U, ¶ 22.[5] The parent must repay the loan (*id.*) or otherwise make the child beneficiary whole. In this case, Max was not the beneficiary named on the policy (he was the insured), but the evidence established that Gary and Kevin intended for the policy to ultimately benefit Max by paying for his college education. The equitable principle expressed in *Morton* applies by way of analogy; Kevin could not take out a loan against an insurance policy intended to benefit Max and keep the money for himself. It appears that repayment of the loan is impossible because, according to insurance documents in evidence, New York Life foreclosed on the policy in November 2021, and the policy no longer exists. So, the equitable remedy for Kevin's misuse of Max's life insurance policy is what the trial court ordered: Gary owns the second Shelby for Max's benefit as a gift to him. That conclusion is not against the manifest weight of the evidence.

---

[5]This court issued *Morton* after January 1, 2021, so we cite it as persuasive authority. See Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025).

¶ 83                                    iii. Third Shelby

¶ 84     The evidence established that Kevin bought the third Shelby in Illinois on May 25, 2021, for $157,500. That day, Gary wired $157,500 to the Med Spa account and Kevin used those funds to pay for the third Shelby. Kevin's name is on the bill of sale. These facts are undisputed.

¶ 85     Kevin's testimony suggested that these funds were also an advance from his retirement account, but we defer to the trial court's rejection of that claim for the reasons stated above. *Supra* ¶ 78. The evidence established that Gary paid for the third Shelby. Providing funds to purchase a car is evidence of ownership. *Birkett*, 331 Ill. App. 3d at 462; *Garner*, 255 Ill. App. 3d at 689-90. Therefore, the trial court's finding that Gary owns the third Shelby is not against the manifest weight of the evidence.

¶ 86                                    iv. Kevin's Arguments

¶ 87     Kevin argues that only his name appears on documents reflecting ownership of the Shelbys, namely, the bills of sale and the certificates of title. The parties did not move the certificates of title into evidence, so we do not consider that argument. See *People v. Woolley*, 178 Ill. 2d 175, 204 (1997) (an appellate court cannot consider an argument that relies on matters outside the record); see also *Interest of M.R.*, 2022 IL App (1st) 211541-U, ¶ 16 (we do not consider evidence that was not admitted at trial). Bills of sale for the second and third Shelbys were in evidence, and only Kevin's name appears on them. But signing a car's bill of sale is just one factor in the ownership analysis. See *Dolan*, 123 Ill. App. 3d at 281. Other factors, namely the parties' intent and Gary providing funds to purchase the cars, support the trial court's finding that Gary owns the Shelbys.

¶ 88    Kevin also contends that "when a lender (Gary) provides the funds to purchase a vehicle, the lender has a lien on the title in the amount of the loan and does not own the vehicle just because the lender provided the funds to purchase." Kevin cites no authority in support of this argument, so he has forfeited it. See *Neuhengen*, 2018 IL App (1st) 160322, ¶ 155. In addition, Kevin has forfeited this argument because he raised it for the first time in his posttrial motion to reconsider. See *A.A. v. Nita A.*, 2023 IL App (1st) 230011, ¶ 35 (citing *Zander v. Carlson*, 2020 IL 125691, ¶ 34). Forfeiture aside, there is no evidence that Gary lent Kevin funds to purchase any vehicles or that he ever held a lien against those vehicles.

¶ 89    Finally, Kevin accuses Gary's counsel of misconduct. Kevin claims that Gary's counsel knew that the Shelbys' certificates of title were in Kevin's name but nevertheless argued that Gary owns the Shelbys. We reject this argument. Title is not dispositive of ownership (*Libertyville Toyota*, 371 Ill. App. 3d at 1013), so Gary's argument was not improper. Additionally, Kevin could have presented the certificates of title as evidence at trial, but he chose not to do so. Kevin did submit the certificate of title for the third Shelby as an exhibit to his posttrial motion to reconsider, and that title bears his name.[6] But the purpose of a motion to reconsider is not to present evidence that could have been presented earlier. *Woolums v. Huss*, 323 Ill. App. 3d 628, 639-40 (2001). Accordingly, the trial court's ruling that Gary owns all three Shelbys is not against the manifest weight of the evidence.

¶ 90                                b. Maserati

---

[6]Kevin also submitted what he claims is the certificate of the title for the second Shelby as an exhibit to his motion to reconsider. That exhibit is a blurry photograph of an illegible document.

¶ 91    Kevin also contends that he owns the Maserati. The evidence established that, at Gary's request, Kevin bought the Maserati on May 22, 2020, for $16,000. Med Spa paid for the Maserati, and the parties intended that it would be a "business car" for Gary to use when he visited the Chicago area. Nevertheless, Kevin titled the Maserati in his own name instead of Med Spa's name. The parties do not dispute these facts.

¶ 92    Kevin titling the Maserati in his name created a presumption that he owned the Maserati. See *Pekin Insurance*, 212 Ill. App. 3d at 677. However, undisputed evidence rebutted that presumption by showing that the parties intended for the Maserati to be a "business car" that belonged to Med Spa. Kevin told Med Spa accountant Portugal that the Maserati belonged to Med Spa. Med Spa paid for the Maserati; Kevin did not fund any portion of that purchase. The trial court's finding that Med Spa owns the Maserati is not against the manifest weight of the evidence.

¶ 93    This case illustrates why the presumption of ownership that a certificate of title creates is rebuttable. A person cannot agree to buy a car on a business's behalf with that business's money, then covertly title the car in his own name and claim ownership of it. Yet that is exactly what Kevin did. We reject Kevin's attempt to assert ownership of a Maserati that, as all parties agree, Med Spa bought for business purposes.

¶ 94    Kevin also raises issues with Gary's pleadings. Kevin argues that Gary's complaint did not allege anything about the Maserati, and when the trial court awarded the Maserati to Med Spa, the five-year statute of limitations on any claim regarding the Maserati had expired. However, Kevin has forfeited these challenges to Gary's complaint. Our supreme court has held that a party forfeits arguments regarding the pleadings by raising those arguments for the first time in a motion to

reconsider. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶¶ 35-36. Parties generally must raise arguments regarding the pleadings at the motion to dismiss stage. *Id.* ¶ 36.

¶ 95    We acknowledge that, in some cases, a defendant may not be able to move to dismiss claims he genuinely does not know the plaintiff is advancing. But in this case, Kevin knew the Maserati was at issue even though Gary's complaint did not mention it by name. Kevin's interrogatory responses addressed the Maserati, and his girlfriend, Katherine Torbick, testified about the Maserati during her deposition. The parties' trial exhibit lists included documents and photographs regarding the Maserati. At trial, both parties' opening statements addressed the Maserati, and both parties presented evidence regarding it. If Kevin believed that Gary was pursuing claims his complaint did not plead, then Kevin should have moved to dismiss Gary's claims regarding the Maserati pursuant to section 2-615 of the Code of Civil Procedure. See 735 ILCS 5/2-615 (West 2022) (allowing a motion to dismiss for failure to plead facts sufficient to support a claim). If Kevin believed that the statute of limitations barred Gary's claims regarding the Maserati, then he should have moved to dismiss pursuant to section 2-619. See *id.* § 2-619(a)(5) (allowing a motion to dismiss for failure to commence the action within the limitations period); *Chicago Title Land Trust Co. as Trustee to American National Bank and Trust Co. of Chicago v. Watkin*, 2025 IL App (1st) 241354, ¶ 24 (the statute of limitations is an affirmative defense that a defendant must plead and prove). But instead of filing a motion to dismiss, Kevin waited until after trial and raised these arguments for the first time in his motion to reconsider. Therefore, Kevin has forfeited these challenges to Gary's complaint. See *Evanston Insurance Co.*, 2014 IL 114271, ¶¶ 35-36. We affirm the trial court's ruling that Med Spa owns the Maserati.

¶ 96                                    2. Constructive Trust

¶ 97    Finally, Kevin contends that the trial court erred by placing the second Shelby in a constructive trust for Max's benefit.

¶ 98    A " 'constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct.' " *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 75 (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 293 (1986)). " 'When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment.' " *Id.* ¶ 76 (quoting *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 299 (2000)). The imposition of a constructive trust is generally a matter within the trial court's discretion, but if there is a question as to the legal basis for the court's order, we review *de novo*. *Jackson v. Callan Publishing*, 2021 IL App (1st) 191458, ¶ 205.

¶ 99    We affirm under either standard. Kevin obtained money (the loan against Max's life insurance policy) to which he was not entitled because Gary intended the life insurance policy as a gift to Max. See *National Union Fire Insurance Co. of Pittsburgh*, 2015 IL App (1st) 122725, ¶ 76. Kevin used that money to buy the second Shelby. Gary testified that Max's life insurance policy is now "completely dissolved. There's nothing left" because "[a]ll the money [Gary] personally put into there is now in the Shelby." As mentioned above, a loan document admitted into evidence indicates that New York Life foreclosed on the policy in November 2021. So, the equitable remedy was to place the second Shelby in a trust for Max's benefit. Therefore, the court's imposition of a constructive trust was proper.

¶ 100   Kevin contends that, like the Maserati, Gary's complaint did not allege anything about Max's life insurance policy or seek a constructive trust, and when the trial court imposed the constructive trust, the five-year statute of limitations for doing so had expired. As explained above, these are arguments for dismissal based on failure to state a claim and the statute of limitations. *Supra* ¶¶ 94-95. Kevin should have raised them in a motion to dismiss, not in a posttrial motion to reconsider. Kevin knew that Max's life insurance policy was at issue because it was intertwined with the purchase of the second Shelby and, at trial, both parties presented extensive evidence regarding the life insurance policy. Kevin has forfeited these arguments as well. See *Evanston Insurance Co.*, 2014 IL 114271, ¶¶ 35-36. Accordingly, we affirm the trial court's imposition of a constructive trust.

¶ 101                                   III. CONCLUSION

¶ 102   For the foregoing reasons, we deny Gary's motion to strike Kevin's statement of facts and affirm the judgment of the circuit court of Cook County.

¶ 103   Motion to strike denied. Judgment affirmed.